MALVERN BRICK & TILE COMPANY *v.* ALEXANDER.

5-432                                                        272 S. W. 2d 77

Opinion delivered October 18, 1954.

[Rehearing denied November 22, 1954.]

*Cole & Epperson, Barber, Henry & Thurman* and *Leffel Gentry,* for appellant.

*House, Moses & Holmes* and *Wootton, Land & Matthews,* for appellee.

ROBINSON, J. The principal issues involved in this cause are the ownership of two certificates of corporate stock of the appellant, Malvern Brick & Tile Company, and the further issue of whether appellee, Verna Cook Alexander, is indebted to her husband, A. B. Alexander, for a part of the purchase price of corporate stock bought from her sister, Mrs. Dorothy Baker, and her mother, Mrs. Essie Cook. The Chancellor held Mrs. Alexander,

the appellee, to be the owner of the two stock certificates in question, and also held that she is not indebted to Mr. Alexander for a portion of the purchase price of the stock bought from Mrs. Cook and Dorothy; Mr. Alexander has appealed from that decree.

A. B. Cook died in August, 1934, leaving as survivors his widow, Essie Bordis Cook, and two daughters, Dorothy Cook (now Dorothy Baker) and Verna Cook (now Verna Alexander, the appellee herein). At the time of his death, Cook owned 4,998 shares of the corporate stock of the A. B. Cook Company, a corporation engaged in the lumber business. One share of stock was owned by his wife Essie and one share by his daughter Dorothy, making a total of 5,000 shares, which constituted all of the stock issued by the corporation. Subsequently the corporate stock structure was changed by reducing the number of outstanding shares to 400. Cook also owned 405 shares of a total of 1,000 shares of stock issued by the Malvern Brick & Tile Company. He also carried life insurance of which his wife was the beneficiary to the extent of approximately $350,000 which was duly paid.

Appellant, A. B. Alexander, had moved to Hot Springs, Arkansas, from Spartanburg, South Carolina, in 1932 for the purpose of establishing a residence in order to secure a divorce. In October, 1934, following Mr. Cook's death in August, Alexander and Verna Cook were married and moved to Spartanburg. At the time of Cook's death the A. B. Cook Company and the Malvern Brick & Tile Company were heavily indebted and Cook himself owed debts of considerable amount, for which his stocks were pledged as security. In his will he left 1/3 of his estate to each of his daughters and 1/3 to his widow. Mrs. Cook used a considerable portion of her insurance money to relieve the financial condition of the two corporations, and to recover the stock which had been put up as security by Cook. 1/3 of the stock had been left to each of the daughters, and they therefore pledged the income from their stock to Mrs. Cook to secure their portion of the debt, $32,000 each. Mrs. Cook also loaned to the A. B. Cook Company $50,000

secured by a mortgage. Also Mrs. Cook bought all of the outstanding stock of the Malvern Brick & Tile Company, consisting of 595 shares, which Mr. Cook did not own at the time of his death. All during the depression and in fact until Mrs. Cook and Dorothy sold their interests in the corporations in December, 1946, Mrs. Cook and the daughters received a substantial income from the corporations, a salary of $500 per month for Mrs. Cook and $250 per month to each of the daughters in addition to certain dividends.

In 1943 appellant herein, A. B. Alexander, husband of Verna, was employed as manager by the two corporations which were owned entirely at that time by Mrs. Cook and the two daughters. In the latter part of 1946, Alexander and his wife Verna decided to attempt to buy the interests of Mrs. Cook and Dorothy. Dorothy owned 1/3 of what had been left by her father, and Mrs. Cook owned 1/3 plus the 595 shares of Malvern Brick & Tile Company stock acquired by her subsequent to Cook's death.

Knowing how much stock Dorothy and Mrs. Cook each owned, Mrs. Alexander became apprehensive that Alexander might purchase for himself this stock from her sister and mother which would give him a little better than 2/3 or a controlling interest in the corporations. Therefore she asked him to write her a letter showing her ownership of one-half of what they might acquire by the purchase of Mrs. Cook's and Dorothy's stock. Pursuant to this conversation he executed and delivered to her the following agreement:

"December 4, 1946

"For the sum of one dollar and love and affection I hereby sell one-half interest that I have or may acquire in the A. B. Cook Co. and the Malvern Brick & Tile Co., both of Malvern, Arkansas, to my beloved wife, Verna Cook Alexander.

"(signed) A. B. Alexander."

Alexander then went to Pass Christian, Mississippi, where he entered into negotiations with Mrs. Cook and

Dorothy for the purchase of their stock in both corporations, and succeeded in purchasing Mrs. Cook's stock for the consideration of $100,000, 1/3 in cash and the balance in deferred payments, and Dorothy's stock for $50,000, 1/3 in cash and the balance in deferred payments. At this time Mrs. Alexander was in a hospital in Baltimore due to an operation for an impacted tooth.

It is contended by Alexander that he bought all of the stock of both corporations from Mrs. Cook; that not only did she have the right to sell her own stock, but she had the authority as trustee under the terms of Mr. Cook's will to sell the stock of Verna and Dorothy, and did sell it. It is the contention of Mrs. Alexander that Alexander bought for the two of them only the interests of Mrs. Cook and Dorothy, that neither she nor Mr. Alexander contemplated that Mrs. Alexander's stock would be sold by Mrs. Cook, and that it was not sold by her.

Subsequent to the purchase of the stock from Mrs. Cook and Dorothy, Mrs. Alexander gave Mr. Alexander her promissory note in the sum of $25,000 dated December 14, 1946. Also Mr. Alexander introduced in evidence what he says is a written contract between him and Mrs. Alexander with reference to the purchase of the stock from Dorothy and Mrs. Cook. However, this alleged agreement is not signed by Mrs. Alexander. Alexander contends it is a valid note and contract; Mrs. Alexander contends it was not a valid transaction but merely done to avoid the possibility of gift taxes.

Mr. and Mrs. Alexander made a trip to Malvern, Arkansas, where they obtained from Mrs. Cook's safe, with her permission, all of the corporate stock of the Malvern Brick & Tile Co. and the A. B. Cook Co. They also obtained the stock books and took both the books and the stock certificates back to Spartanburg. Later they re-issued the stock, 50% to each.

Now comes one of the principal disputes between the parties, and the testimony on this point is in irreconcilable conflict. Mrs. Alexander contends that it was recognized by both her and Mr. Alexander that she owned her

original 1/3 interest left by her father plus ½ of whatever interest was acquired from Mrs. Cook and Dorothy; hence that she owned approximately 2/3, but that Mr. Alexander did not want the stock issued approximately 2/3 to her and 1/3 to him because he stated that the employees of the company would then know that he did not own the controlling interest and therefore their services would not be as satisfactory as otherwise. She further says that for this reason and at his suggestion, the stock was issued 50% to each; and he in turn endorsed and delivered one certificate in each corporation to her at the time of the issuance of the stock certificates; that the two certificates of stock signed and delivered to her by Mr. Alexander represented enough shares to show her ownership of approximately 2/3 in each corporation. However, the shares of stock represented by the two certificates in issue give Mrs. Alexander a little over 2/3 ownership in both corporations. Mrs. Alexander further contends that she placed these two certificates. of stock transferred to her by A ᴗxander, along with the other stock that had been issued to her, in a lock box to which both she and Alexander had access; and later without her knowledge or consent Alexander removed from the box the two certificates of stock he had transferred to her.

Alexander's version of the transaction is that the stock was issued 50% to each at the time, and at a later date Mrs. Alexander, being apprehensive of difficulty she might have with Mr. Alexander's former wife, insisted that he endorse the two certificates to her in order to give her control of the corporations in event of his death; that he did sign the certificates over to her by endorsement thereon, but that he did not at any time deliver these two certificates to Mrs. Alexander but placed them in his private lock box at the Alexander Music Company in Spartanburg; and that Mrs. Alexander did not have access to that box.

Later it was decided to merge the two corporations, and while in Florida Mrs. Alexander saw a letter received by Mr. Alexander from a certified public accountant in Little Rock asking for the stock so that the merger could

be completed. Mrs. Alexander spoke to Mr. Alexander about this matter, and he stated that he had mailed all the stock, including his and Mrs. Alexander's to himself at Malvern. Mrs. Alexander was going with their son as far as Dallas on his way to school at Tucson; upon leaving Dallas, instead of returning to Florida she went to Malvern. There she had a colored man who had been in the employ of the Cook family for about 30 years, go to Mr. Alexander's desk at the lumber company office with instructions to get a large brown envelope, rather bulky, from Mr. Alexander's desk if it was there, and bring it to her at the old home in Malvern. The colored man found the envelope which Alexander had mailed to himself at Malvern and took it to Mrs. Alexander. It contained all the stock certificates of both corporations. She removed the ones originally issued to her and the two that Mr. Alexander had endorsed to her. She placed a note in the envelope telling Mr. Alexander what she had done, explaining that she had no ulterior motives and that she hoped he would continue in the management of the companies and that their relationship would be more pleasant than it had been in the past several years.

When Alexander found out that Mrs. Alexander had gone to Malvern, he immediately called his office there in an attempt to beat her to the brown envelope, but his effort in this respect failed. Later Mrs. Alexander filed this action to compel the transfer to her on the books of the corporation of the two certificates of stock endorsed to her by Mr. Alexander. In the meantime by agreement of the parties, the two corporations merged under the name of The Malvern Brick & Tile Company, with both parties' rights fully protected by the agreement.

Mr. Alexander filed an answer in which he denied that the two certificates of stock in question were ever delivered to Mrs. Alexander, and alleged that she wrongfully obtained possession of them. He further alleged that the two of them had bought all of the stock from Mrs. Cook; that Mrs. Alexander had executed to him her note in the sum of $25,000 due December 14, 1947, and had agreed to pay 50% of the purchase price of the stock.

He further alleged that Mrs. Alexander had paid no part of the note except two credits, one in the sum of $100 and one in the sum of $500, which he had given to her as Christmas presents, and that she had made no effort whatever to pay her part of the purchase price of the stock. Alexander further alleged: ''The defendant is entitled to rescind and cancel said contract and be declared the legal owner thereof, and is entitled to a return to him of the stock certificates represented thereby. Wherefore, premises considered, the defendant prays that the plaintiff be denied the relief sought in her complaint; that the alleged transfer and endorsement of stock certificates Nos. 55 and 60 of the present Malvern Brick & Tile Company be declared invalid and cancelled and that such certificates be returned to this defendant; that the sale by the defendant to the plaintiff of stock certificates No. 52, 53, 57, 58 and 59 of the present Malvern Brick & Tile Company be rescinded for a failure of consideration and that such stock certificates be declared to be the property of this defendant; for all cost herein expended and for any and all other legal or equitable relief to which this defendant may be entitled.''

This counter claim was filed December 6, 1952. The five-year statute of limitation on the alleged contract and note expired December 14, 1952. It is not contended that the alleged gifts by Alexander endorsed on the note constitute payments by Mrs. Alexander. Subsequent to the 25th day of March, 1953, Alexander filed an amendment to his counterclaim in which he asked judgment against Mrs. Alexander in the principal sum of $74,600 and $20,540 as interest on the contract and note which he alleged was entered into on the 14th day of December, 1946.

Mrs. Alexander filed an answer to the amended counterclaim in which, in addition to a general denial, she pleaded equitable defenses as well as the statute of limitations.

Upon a trial, the Chancellor made a finding that Mrs. Alexander was the owner of the two stock certificates in question and ordered them transferred on the books of

the corporation, and further found in her favor on the counterclaim of the defendant.

The record here is voluminous; the abstract of the evidence consisted of 698 pages; and to set out the testimony on which the Chancellor made his findings would unduly extend this opinion. After a careful review of all the evidence in the case, however, we have reached the conclusion that we cannot say the Chancellor's findings on the question of ownership of the two certificates of stock in issue are contrary to a preponderance of the evidence.

Whether the two certificates of stock were delivered to Mrs. Alexander at the time of their issuance is of prime importance. The parties' testimony on this point is in hopeless conflict. There are circumstances that support both sides. Mr. Alexander is supported in his testimony by the fact that on one certificate of stock endorsed to Mrs. Alexander a different colored ink was used from that used on the endorsement of the other certificate. On the other hand, it is not likely that Mr. Alexander ever considered that he was buying from Mrs. Cook and Dorothy any more than the interests they personally owned, and the written contracts he made with them so indicate. In addition to the testimony of Mrs. Alexander and Dorothy, the circumstances strongly indicate that Mr. Alexander only intended to buy and did buy from Mrs. Cook the stock she personally owned. He agreed to pay her $100,000 of which 1/3 was paid at the time of purchase, and the balance in deferred payments. He agreed to pay Dorothy $50,000 in a like manner. He claims that he bought all the stock from Mrs. Cook and attempts to explain his payment to Dorothy by saying it was merely a gesture on his part so that she would not object to her mother making the sale. Evidently this testimony was not convincing to the Chancellor, nor is it convincing to us. Mrs. Cook paid Mrs. Alexander nothing that she received from the sale, but on the contrary reported all the money on her income tax report as her personal funds. According to the preponderance of the evidence, Alexander did not buy Mrs. Al-

cxander's stock from Mrs. Cook. Hence whether Mrs. Cook as trustee under Mr. Cook's will had authority to sell Mrs. Alexander's stock is of no consequence.

It is wholly impractical to set out here all the inferences to be derived from the evidence. But from all the evidence taken together, we are convinced that Mr. Alexander never at any time owned more than one-half of the interest of Mrs. Cook and Dorothy in both corporations; and ever since the time of the issuance of new stock in both corporations by Mr. & Mrs. Alexander, Mrs. Alexander has owned a little over ½ of the interest purchased from Dorothy and Mrs. Cook (this fraction of a little over ½ being due to the manner in which by agreement the stock was divided), in addition to the 1/3 interest left to her by her father.

Next is the counterclaim of Mr. Alexander asking judgment in the sum of $95,140 as principal and interest on ½ of the purchase price of the stock acquired from Mrs. Cook and Dorothy. The equities in regard to this feature of the case appear to be in favor of Mrs. Alexander. We are convinced that practically all of the money used in paying Dorothy and Mrs. Cook for their stock came to Alexander by reason of his position with the two companies. From January 1, 1947, through March 31, 1952, he received from the A. B. Cook Company and the Malvern Brick & Tile Company over $400,000. But regardless of the equities of the case, the claim is barred by the statute of limitations. The note for $25,000 given by Mrs. Alexander to Alexander, was due on the 14th day of December, 1947. The five-year period expired on the 14th day of December, 1952. Appellant's amended counterclaim in which he seeks to recover judgment for 50% of the purchase price of the stock obtained from Mrs. Cook and Dorothy was not filed until after March 25, 1953, which was more than five years after the note became due. Appellant contends that the statute of limitations does not apply because the original counterclaim was filed before the five-year period expired, and that the amended counterclaim dates back to the date of the original counterclaim.

In the original counterclaim, Alexander did not seek to enforce the provisions of the note or the alleged contract for the sale of stock. On the contrary, he sought to rescind and cancel the alleged agreement. The alleged contract and note were mentioned in the original counterclaim, but were not mentioned in the sense of enforcing the provisions thereof. In support of his contention in regard to the statute of limitations, appellant cites *Western Coal & Mining Co.* v. *Corkille,* 96 Ark. 387, 131 S. W. 963; this was a personal injury case. An amendment to the complaint was filed subsequent to the time that the statute of limitations would ordinarily have expired; however, the amended complaint in no way sought to change the nature of the cause of action. It merely set out more definite and certain allegations as to just how the injury occurred. There the court said: ''It was only a statement of the original cause of action in a more complete manner, and merely amplified the original complaint. . . . The negligent accumulation of the dangerous gases was the basis of the cause of action, and the breaking of the brattice was only a specific statement of how the gases accumulated, and thus a more specific statement of the averments of the original complaint of the negligence of the defendant. The amendment was therefore only a continuation of the original complaint, and it took effect as of the date when the latter was filed.''

Also appellant cites *Baldwin* v. *Brown,* 166 Ark. 1, 265 S. W. 976, as authority for the rule that the statement of facts and not the prayer for relief constitutes the nature of a cause of action. However, on rehearing in that case the court said: ''The result of these decisions is that, if a plaintiff asks for a particular relief, and other relief, he can have no relief inconsistent with such particular relief, although founded upon the complaint. . . . It is conceded that the rendering of a personal judgment against Hurst in favor of the plaintiff is not the special relief sought by her, and, if the decree in this respect is to be sustained, it must be under the general prayer for relief. As we have just seen, under a general prayer the relief given must be agreeable to the case made by the

complaint and not different from it or inconsistent with it.''

The court further said on rehearing in the *Baldwin* case: ''As above stated, if the plaintiff was doubtful about what her rights were, she would have asked alternative relief in her prayer. She alleged in positive terms that Mrs. Wilson was a party to the alleged fraud. If she was in any doubt about this matter, she could have asked alternative relief in the way of a personal judgment against the other defendants, in case the court should find that Mrs. Wilson had advanced the money in good faith and had taken the mortgage to secure it. Having planted herself upon the issue that Mrs. Wilson was a party to the fraud, and that her mortgage should be canceled, we do not think it would be consistent with the state of the pleading to render a personal judgment against Hurst for damages.'' Likewise in the original counterclaim filed in this case, Alexander did not ask for damages for breach of contract or a judgment on the note, but asked for the cancellation and rescission of an alleged contract; and at the time the statute of limitations expired, no counterclaim or suit had been filed by Alexander upon which he could have been awarded damages or judgment on the note. The amended counterclaim filed subsequently was wholly inconsistent with the relief sought in the first counterclaim.

Appellant cites *Grytbak* v. *Grytbak*, 216 Ark. 674, 227 S. W. 2d 633, which was a divorce case. Alimony was allowed the wife, although the prayer did not specifically ask for such relief. There it was held that the statement of facts in the complaint or cross-complaint, and not the prayer for relief, constitutes the cause of action. The wife had alleged that she was without funds to support herself and pay the costs of litigation, and prayed for temporary relief out of funds belonging to appellee and for all other equitable relief. The court held that the facts pleaded warranted the allowance of alimony, and that the general relief asked was not inconsistent with the special relief prayed for.

*Albersen* v. *Klanke,* 177 Ark. 288, 6 S. W. 2d 292, cited by appellant, is in no way inconsistent with the rules announced on rehearing in *Baldwin* v. *Brown, supra.*

In *Bridgman* v. *Drilling,* 218 Ark. 772, 238 S. W. 2d 645, it is said: "Our cases hold that where there is an amendment to a complaint stating a new cause of action or bringing in new parties interested in the controversy, the statute of limitations runs to the date of the amendment and operates as a bar when the statutory period of limitation has already expired. In other words, if the plaintiff amends his complaint after commencement of the suit by introducing a new cause of action, the statute continues to run until the filing of the amendment which does not relate back to the commencement of the suit." Citing cases. "If, however, the amendment to the complaint does not set forth a new cause of action, but is merely an expansion or amplification of the cause of action already stated, then the amendment relates back and takes effect as of the date of the commencement of the original action."

Here the amended counterclaim sets up a completely new cause of action; although based upon the same facts set out in the original counterclaim, there is no similarity between the two causes of action. The first counterclaim was for the cancellation of an alleged contract and nothing more. It was not a suit for damages; it was not a suit on a note; it was not a suit to enforce the provisions of a contract. The relief sought in the amendment to the counterclaim is wholly inconsistent with the relief sought in the first instance. By the amendment an attempt was made to enforce an alleged contract and collect on a promissory note.

In *Brooks, et al.* v. *Arkansas-Louisiana Pipeline Co.* (C. C. A. Ark. 8), 77 Fed. 2d 965, the court said: "In the application of this rule it must be considered whether the subsequent suit between the same parties is upon the same or a different cause of action. Although the facts alleged in this case are the same as in the first suit, the causes of action are not identical. 'A cause of action does not consist of facts, but of the unlawful violation of

a right which the facts show.' *Baltimore S. S. Co.* v. *Phillips, supra; Vinson* v. *Graham* (C. C. A. 10), 44 F. 2d 772, 774. The same facts may manifest the violation of separate and distinct legal rights, each giving rise to a separate cause of action.''

Appellant has touched upon other points, such as the burden of proof, the equities, the question of whether the stock was transferred in accordance with the by-laws of the corporation, the refusal of the court to allow the taking of further depositions, and the validity of the exchange agreement between the Chancellors. We have examined all of these points and find that there is no merit in appellant's contentions with reference thereto.

Affirmed.

Mr. Justice WARD dissents as to division of stock.