Alonzo B. **ALEXANDER**, Appellant,

v.

Verna Cook **ALEXANDER**, Appellee.

No. 7086.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 17, 1955.

Decided Jan. 4, 1956.

James H. Price, Greenville, S. C., Horace L. Bomar, Spartanburg, S. C. (Neville Holcombe, James D. Poag, Greenville, S. C., Holcombe & Bomar, Spartanburg, S. C., Price & Poag, Greenville, S. C., on the brief), for appellant.

D. H. Redfearn, Miami, Fla., J. Davis Kerr, Spartanburg, S. C. (Sam R. Watt, Kerr & Evins, Spartanburg, S. C., and Redfearn & Ferrell, Miami, Fla., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This is a suit for malicious prosecution by Verna Cook Alexander against her husband, Alonzo B. Alexander, based on the charge that on January 20, 1954 he maliciously and without probable cause filed a petition against her in the County Judge's Court of Broward County, Florida, and had her committed as a mental incompetent to the psychiatric ward for mental patients in Jackson Memorial Hospital in Miami. The charge was denied and the case was heard before a jury in the District Court which found for the plaintiff in the sum of $175,000 actual damages and $75,000 punitive damages. The District Judge, after considering a motion for a new trial, ordered that a new trial be had unless the plaintiff remit the sum of $87,500. The plaintiff accepted the remittitur and judgment was entered for $87,500 actual and $75,000 punitive damages. The principal grounds of this appeal are that the judge erred in refusing to direct a verdict for the defendant for failure of proof as to malice and want of probable cause, and

in his rulings on evidence and in his charge to the jury.

The evidence concerning the relations between the parties and the events which led to this suit ranged over a considerable area and a long period of time. For our present purposes it may be summarized as follows:

The parties were married on October 1, 1934 at Little Rock, Arkansas. Prior to marriage the plaintiff had lived at Malvern, Arkansas with her parents. Her father, A. B. Cook, who died earlier in that year, had the principal interest in the Malvern Brick and Tile business and also in the A. B. Cook Company, a lumber business. Upon his death both holdings passed to his wife and to the plaintiff and her sister.

The defendant was a graduate of the United States Naval Academy and a resident of Spartanburg, South Carolina, who had inherited from his father certain real estate including the family residence and also a music store in Spartanburg. At the time of his marriage he was 37 and she was 24 years of age. They had one child who was afflicted with an incurable disease and was 16 years of age at the time of the trial below and has since died.

The estate of A. B. Cook was heavily in debt and after his death the two businesses in which he was interested did not prosper. In 1943 Alexander took charge of them at the request of his wife and mother-in-law and managed them with such success that when the present suit began they had a net worth in excess of one million dollars. He testified that he lent large sums of money to the business and gave his services as managing head without salary for a certain period of time. In 1946 he purchased stock in these enterprises for $150,000. The purchase included the one-third interest of his mother-in-law, the one-third interest of his wife's sister, and, according to his testimony, the purchase also included his wife's one-third interest so that he acquired the entire stock of the business. Thereupon he transferred one-half of the

stock to his wife. At the time of the trial below the two businesses had been merged into a single company known as Malvern Brick and Tile Company, of which he was the president at a salary of $36,000 a year while his wife was vice-president and secretary at a salary of $12,000 a year. The business owned an elaborate and valuable demonstration house which was built in 1950 at Hillsboro Beach, Florida. There is some evidence that for some time prior to 1952 the relations between husband and wife had not been harmonious. For the most part they lived in Spartanburg but they also spent considerable periods of time at the Cook residence on company property in Arkansas and also at the Hillsboro house in Florida. They placed their son in school at Palm Beach on October 1, 1952.

Various controversial matters between husband and wife came to a head in this year and steadily increased. For our purposes it is sufficient to state the general nature of the disputes without going into detail. Perhaps the most important relates to the ownership of the stock in the Malvern Brick and Tile Company in which he claimed that he and his wife each owned 50 per cent of the stock whereas she claimed that she owned 71 per cent and he 29 per cent thereof. This dispute became of especial significance when she separated from him and entered suit for a divorce in October, 1952 in Arkansas on the ground that he had treated her with contempt and indignity, and had made her life intolerable. While this suit was pending he secured a restraining order from a Florida court prohibiting her from removing the contents of certain safe deposit boxes. In November '52 she also brought suit against him in Arkansas in which she set up her claim to the ownership of 71 per cent of the stock and sued in order that the books of the company be changed to show her title. This case came to trial and resulted in a judgment in her favor on October 17, 1953. The decision was appealed to the Supreme Court of the State and was pending during the trial of the case below. Malvern Brick & Tile Co. v. Alexander, Ark., 272 S.W.2d 77. Subsequently the judgment was affirmed by the Supreme Court of the state. While this litigation was going on the husband stopped the payment of his wife's salary as an officer of the company.

In addition to these sources of conflict the wife accused her husband of removing $20,000 worth of furniture from the Florida house. There was also litigation between them over the contents of the South Carolina residence. The husband had put this house in the name of the wife with the understanding that she was to spend some money in the improvement of the property, taking back from her a deed to be recorded in case anything should happen to her. When the difficulties arose the husband recorded the deed without compensation for such monies as she claimed she had spent upon the property. There was also dispute as to the ownership of the music store in Spartanburg which the husband had inherited from his father in which she claimed a half interest.

The divorce suit brought by the wife in Arkansas was dismissed for lack of jurisdiction and on October 20, 1953 the husband brought suit for divorce against his wife in the courts of South Carolina on the ground of desertion.

During the year 1953 the wife wrote the husband a series of letters in which she expressed the utmost loathing and contempt for him in the most violent and venomous terms and stated that he had been guilty of conduct worthy of imprisonment for crime. She accused him in one letter of improper relations with a woman although at the trial below she offered no evidence to support the claim; and on the eve of Christmas, 1953 she sent him a Christmas greeting couched in scornful and bitter terms. It was under these circumstances that the events occurred which gave rise to the pending suit.

In December, 1953 the wife went to Florida and stayed at the Hillsboro House during the Christmas season. The boy spent Christmas with his fa-

ther and then went to Hillsboro to spend New Year's day with his mother. After the holidays the boy returned to his school at Palm Beach and his mother was about to return to Arkansas when she learned that he had become very ill and she had him taken to the Jackson Memorial Hospital in Miami. Dr. Ann Louise Hendricks, their family physician, accompanied her on this trip. In the middle of January, 1954 the father came to Florida to visit his son at the hospital. He testified at the trial that one day while behind a screen he overheard his wife tell the boy that she would like to see her husband lying dead in the gutter covered with slime and that she was going to have him put in jail. She denied making this statement.

The following day the husband consulted Dr. Hendricks about his wife's condition telling her of the statement which he had overheard and showing her the Christmas card which he had received from her. Dr. Hendricks had attended all three members of the family on prior occasions. She was a general practitioner but she had had experience in mental hospitals and practiced psychiatry and attended patients with minor mental disorders to some extent. She had previously treated Mrs. Alexander in July, 1951 and had sent her to a hospital for extreme nervousness. In December 1952 she again found Mrs. Alexander extremely nervous and agitated and made an en-

gagement for her to consult a psychiatrist but Mrs. Alexander failed to keep the appointment.

Dr. Hendricks was of the opinion in January, 1954, when consulted by Mr. Alexander, that his wife was verging on a paranoid condition and she arranged for him to see Drs. Anderson and Jarrett who specialized in psychiatry. They advised him to take compulsory legal proceedings to have her examined, since she had not kept the prior engagement.

Alexander also consulted George Leaird, a Florida lawyer, who had previously represented him in getting the restraining order as to the safe deposit boxes. He showed the attorney the offensive letters his wife had written and told him that he and his wife had had domestic troubles and litigation, but he did not tell the lawyer about his suit for divorce against his wife or that he had cut off his wife's salary or about the disputes between them in respect to the Arkansas business, the house in Florida, or the house in Spartanburg. Alexander also summoned James C. Cole, an Arkansas lawyer who had represented him in the litigation in that state, and had previously advised him that he could not compel Mrs. Alexander to submit to a mental examination under the laws of Arkansas.

The two lawyers and the two psychiatrists advised Alexander to take steps to have his wife examined under the Florida law and he decided to do so.[1]

---

1. F.S.A. § 394.20 *"Petition for examination of persons believed to be mentally or physically incompetent*

    "(1) *Petition.*—Whenever any person within this state is believed to be incompetent by reason of sickness, drunkenness, excessive use of drugs, insanity, or other mental or physical condition, so that he is incapable of caring for himself or managing his property, or is likely to dissipate or lose his property or become the victim of designing persons, or inflict harm on himself or others, application by written petition, under oath, may be made to the county judge of the county wherein the alleged incompetent resides or may be found, or, in the absence or disability of the county judge, to the judge of the circuit court of the county wherein such petition is filed, for a judi-

cial inquiry as to the mental or physical condition, or both, of the alleged incompetent."

    F.S.A. § 394.21 *"Procedure to determine incompetency; notice; hearing*

    "(1) *Notice; hearing.*—Whenever a petition is filed under the provisions of § 394.20, the county judge, or, in his absence or disability, a circuit judge, shall set a date for an immediate or a very early hearing on the petition. Reasonable notice shall then be given in writing to the alleged incompetent and to one or more members of his family, if any (other than petitioner), are known to the county judge to be residing within his jurisdiction, notifying them that application has been made for an inquiry into either the mental or the physical condition, or both, of the alleged incompetent

In accordance with these statutes an admission note was prepared by the two doctors for the admission of Mrs. Alexander to the mental ward of the Jackson Memorial Hospital. A petition for the examination of his wife was presented by Mr. Alexander's attorney to the County Judge on January 20 and an order was signed by the judge for her examination by Drs. Anderson and Jarrett on February 1, and for her detention in the meantime. The same afternoon she was taken into custody by deputy sheriffs, including a woman jail nurse, and taken to the hospital where she was placed in a section known as the Dade County Mental Institution. By order of her husband and by the usual practice in such cases she was not allowed to make any telephone calls until she was registered at the hospital. She then called a friend in Arkansas who secured an attorney for her in Miami. She was placed in the women's ward in a room with four cots and with inadequate toilet facilities where she remained three days and endured many unpleasant experiences.

On January 23 a petition for habeas corpus was presented by her attorney to a Circuit Judge and she was released for an examination by the doctors appointed by the county court. She was also given a Rorschach test by another physician.

All the doctors reported that she was mentally competent, and an order to that effect was signed by the County Judge who had committed her.

Enough has been said to show that the District Judge committed no error in submitting the case to the jury. Under the law of Florida if a proceeding to have a person declared insane and restrained of his liberty has terminated in his favor, and he has been damaged as a result of the proceeding, he can recover in an action for malicious prosecution against the person bringing the proceeding provided the suit was instituted maliciously and without probable cause.[2] The element of malice can be inferred from a finding that probable cause was lacking;[3] but the fact that the proceeding was brought with malice does not furnish a basis for inferring lack of probable cause, and unless the plaintiff meets the burden of proving that it was brought with malice and without probable cause the court must rule as a matter of law that there can be no recovery.[4]

Where there is a reasonable ground for suspicion of insanity supported by circumstances sufficient to warrant an ordinarily prudent man to believe that the person proceeded against is insane there is probable cause. If

and that a hearing on such application will be had before the judge having jurisdiction at the time and place to be specified in said notice. Said notice shall inform the said person that he may be heard, either in person or by counsel.

"(2) *Detention of alleged incompetent.*—(a) If it appears, before the date of the hearing, from evidence produced before the judge, by affidavit or otherwise, that it is for the best interest of the alleged incompetent or others that he be detained for observation and examination, said judge may order that said alleged incompetent be placed in the protective custody of the spouse or of one or more of the near relatives of the incompetent or in the protective custody of any other responsible citizen of the state.

"(b) If the alleged incompetent is detained for observation and examination, the judge may, if in his opinion the public safety requires it, direct that the sheriff forthwith confine said alleged incompetent in some specified place until the further proceedings herein provided for have been had, or until his further order; the judge may also order the detention of said person for such reasonable time as may be necessary for proper medical observation and examination, not to exceed fifteen days, unless extended for good cause; provided, that in all such cases, there shall first be filed with said judge an affidavit setting forth facts which make such detention necessary."

2. Fisher v. Payne, 93 Fla. 1085, 113 So. 378.

3. Duval Jewelry Co. v. Smith, 102 Fla. 717, 136 So. 878.

4. Tatum Bros. Real Estate & Investment Co. v. Watson, 92 Fla. 278, 109 So. 623; Ward v. Allen, 152 Fla. 82, 11 So.2d 193.

the facts are undisputed and only one inference can be drawn from them the question of existence of probable cause is for the court to determine,[5] but when the facts relied on to show probable cause are in dispute, their existence is a question of fact for the determination of the jury.[6]

██ If the proceeding is instituted by a person on the advice of counsel probable cause is established; provided he has obtained and followed the advice in good faith rather than as a mere pretext or cover for his personal ends, and provided he has made a full and fair disclosure to the attorney from whom the advice is obtained.[7] There is another qualification of the rule which does not seem to have been passed on by the Florida courts, but is given a general application. There cannot be justifiable reliance upon the opinion of an attorney who is known to have an interest of his own to protect by the proceeding,[8] or is prejudiced against the person proceeded against.[9] This latter rule may be considered a part of the "good faith" requirement.

██ In the instant case the defendant Alexander conferred with and took the advice of two lawyers and three doctors before proceeding in the Florida court, and on this account he contends that the District Judge erred when he refused a motion to direct a verdict for the defendant based on the ground that he had probable cause to bring the suit. The judge submitted the question to the jury telling them that probable cause must be upon such facts as will warrant a cautious, reasonable and prudent man in the honest belief that he has lawful grounds for proceeding against the defendant;[10] and that a defendant in an action for malicious prosecution has the right to rely upon professional advice in instituting a proceeding, but only after a full and fair disclosure of all the pertinent facts and circumstances is first made to counsel upon whom he intends to rely for professional advice and who could be reasonably expected to render an unbiased opinion. The judge left to the jury to determine whether Alexander did make such disclosures to his advisers in this case.

██ This action was correct since there was evidence tending to show that the defendant did not disclose to the doctors and to the lawyers all the pertinent facts which threw light on the relations between him and his wife and her attitude toward him. According to the evidence Alexander did disclose to the doctors the statements which his wife had made and the letters she had written to him but he did not tell them about a number of the controversies which had arisen between him and his wife, including amongst other things the law suit over the ownership of the stock in the Arkansas corporation which had been decided in her favor or about the other controversies and litigation relative to her salary, the contents of her safe deposit boxes in Florida, the furni-

5. White v. Miami Home Milk Producers Ass'n, 143 Fla. 518, 197 So. 125.

6. Anderson v. Bryson, 94 Fla. 1165, 115 So. 505.

7. Restatement of Torts, § 666; Duval Jewelry Co. v. Smith, supra, note 2; Florida East Coast R. Co. v. Groves, 55 Fla. 436, 46 So. 294; National Surety Co. v. Page, 4 Cir., 58 F.2d 145.

8. White v. Carr, 71 Me. 555; Union v. United Battery Service Co., 35 Ohio App. 68, 171 N.E. 608; Adkin v. Pillen, 136 Mich. 682, 100 N.W. 176.

9. Lawrence v. Cranford, 253 Ala. 389, 44 So.2d 573; Smith v. Fields, 139 Ky. 60, 129 S.W. 325, 30 L.R.A.,N.S., 870; Perrenoud v. Helm, 65 Neb. 77, 90 N.W. 980; See also Restatement of Torts, § 666, comment (c); 34 Am.Jur. 751.

10. The defendant contends that this definition of probable cause was erroneous because the words "cautious, reasonable and prudent man" were not preceded by the qualifying word "ordinarily". We do not think that in this instance the omission of the correct qualifying word was prejudicial. In other parts of the charge the judge used the words "reasonably prudent man" in defining probable cause.

ture in the South Carolina and Florida houses, or about his suit for divorce against her in Spartanburg.

Mr. Alexander did disclose to his Florida lawyer the communications he had received from his wife and he did tell him that she had brought suit against him for divorce. The lawyer was also familiar with some of the Florida litigation, as we have seen, but he was not told about the cutting off of the wife's salary or about the suit in Spartanburg over the contents of the residence or about the decree in the Arkansas suit over the stock in the corporation or about the pending divorce suit in South Carolina.

The Arkansas attorney had full knowledge as Alexander's attorney of all the matters involved; but he had participated in a corporate meeting which attempted to oust Mrs. Alexander as a director and subsequently he was removed himself as a director at the suit of Mrs. Alexander. He had also been the unsuccessful attorney in the suit over the corporate stock. Moreover, he admitted as a witness that he had a personal bias in favor of the husband; and he did not profess to be familiar with the law of Florida so as to qualify him to advise his client in respect thereto. See the Restatement of Torts § 666, Comment H.[11]

It is clear from this recital that there was no error in leaving it to the jury to determine whether sufficient disclosures had been made to the Florida doctors and lawyer to justify a verdict in his favor on the ground that he had probable cause to institute the inquiry. We do not mean to say that the plaintiff was entitled to a verdict if the jury should find without more that full disclosure had not been made by the defendant to his advisers. It was still necessary for the plaintiff to show that the defendant had acted maliciously and without probable cause. It was still the duty of the jury to take into consideration the evidence which showed that before instituting the proceeding against his wife Alexander had taken the advice of Dr. Hendricks, the family physician, who was seemingly on friendly terms with Mrs. Alexander and had recently been with her for a considerable period of time and had formed the tentative opinion that she was bordering on a case of paranoid. In addition the jury was able to take into consideration the advice which he had gotten from the other physicians and from his Florida lawyer. In other words, it was the duty of the jury to consider all the evidence in the case in determining whether the defendant acted maliciously and without probable cause.

We think, however, that errors prejudicial to the defendant were committed in the rulings of the court on questions on evidence. Liberal scope was permitted to the attorneys for the plaintiff in the cross examination of the defendant and incidents in his past life were brought out that had little or no relation to the controversy before the court. Over the objection of the defendant it was brought out that immediately after the death of his father in 1934 there was litigation between him and his sister over his appointment as administrator of his father's estate. He was questioned about his relations with his first wife from whom he had been divorced, and about the frequency of his contacts with his son by his first wife and his grandchildren. He was also asked about a threatened suit against him for alienation of affections which was never filed. The relevancy of such questions must ordinarily be left to the good judgment and discretion of the trial

11. We have no occasion to decide whether probable cause is shown for a lunacy proceeding if it is instituted upon the advice of physicians to whom full and fair disclosure has been made. The point does not seem to have been decided in Florida. It is discussed in 145 A.L.R. 724. The extent of the disclosure in the pending case is a jury question. The information given the Florida lawyer was quite as extensive as that which was told to the doctors—and if the jury had found it to be adequate, that would have ended the plaintiff's case.

judge, and we should hesitate to say that the admission of this evidence, taken by itself, was sufficient to require a reversal. The rulings, however, were not without significance in a case in which feeling ran high and every effort was made to place the defendant in the worst possible light so that the jury was persuaded to find actual damages so excessive that the judge cut them in half.

The prejudice to the defendant from this source is more readily realized when rulings which excluded evidence offered on his behalf are considered. The "admission note" which was signed by the psychiatrist and was the basis of the order of the County Judge for the detention and examination of the plaintiff was excluded. It contained a summary of the preliminary examination of the doctors and showed the information which they had received from the husband; and their opinion that the wife should be held for examination, and their tentative diagnosis of a paranoid condition, as well as a recommendation that she be kept in a convalescent ward. This document was clearly admissible to supplement the other papers in the proceeding including the petition of Alexander and the orders of the County Judge and the final report of the physicians after the detention which the plaintiff had put in evidence. Furthermore, the note furnished formal documentary corroboration of the advice the doctors had given to the husband and had a direct bearing on the questions of good faith and probable cause in originating the inquiry.

For the same reason the case history which was prepared by the doctors and considered by the County Judge in making his final order of release should have been admitted. It was rejected by the court seemingly because it

was not sworn to but it showed among other things the examination of the wife by the doctors on several days and contained statements made by the wife to them indicating that she seemed to have turned against her invalid son, and that other members of her family had suffered nervous breakdowns; and it concluded with the statement that paranoia is often difficult to detect and that the case was so obscure that the need of an evaluation by a psychologist was indicated.

It was also error to reject the deposition of Dr. Jess Spirer the psychologist to whom the case was referred by the other physicians for a Rorschach or inkblot test. It would have shown to the jury that in the doctor's opinion Mrs. Alexander was not psychotic but that she had some of the qualities of a mildly paranoid person in that she was a nagging hypercritical individual, suspicious of persons and things around her and so was likely to make life miserable for those who came in close contact with her.

The prejudice to the defendant by the exclusion of this testimony is emphasized by the circumstance that Mrs. Alexander was allowed over the objection of the defendant to testify that the two psychiatrists and the psychologist had given her a clean bill of health, while the written reports of these professional men above described were excluded from the jury.

We think it was also admissible for the defendant to show that doubt as to his wife's mental condition was expressed in his presence to the County Judge by Dr. Hendricks and his Florida attorney before the order of commitment was signed.[12]

In our opinion, all of this testimony had a direct bearing on the questions of malice and probable cause, and upon the

---

12. Minor questions of evidence related to the exclusion of testimony as to the reputation of the Florida lawyer for truth and veracity and the refusal to permit one of the physicians to answer a hypothetical question. We think that the testimony as to reputation was admissible under the decision in Woods v. Thrower, 116 S.C. 165, 107 S.E. 250, 15 A.L.R. 1062, but that the ruling on the hypothetical question was correct since it did not sufficiently cover the circumstances of the case.

**120**

amount of actual and punitive damages to be awarded, and should have been given to the jury. On this account the judgment of the District Court is

Reversed.